# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LINDA SUE SMITH,                          Case No. 1:10-cv-923
      Plaintiff                        Spiegel, J.
                                          Litkovitz, M.J.

      vs


COMMISSIONER OF                           **REPORT AND**
SOCIAL SECURITY,                          **RECOMMENDATION**
      Defendant


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 10) and the Commissioner's response in

opposition (Doc. 15).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in April 2006, alleging disability since

December 15, 2001, due to back pain, anxiety and depression. Plaintiff's applications were

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a

de novo hearing before ALJ John M. Prince. Plaintiff and a vocational expert (VE) appeared and

testified at the ALJ hearing. On November 3, 2008, the ALJ issued a decision denying plaintiff's

DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied,

making the decision of the ALJ the final administrative decision of the Commissioner.

## II.  Medical Evidence

### A. Physical Impairments

Plaintiff treated with Dr. Michael B. Holliday for several years.  In July 2002, plaintiff was seen by Dr. J. Blair Chick in Dr. Holliday's office.  Plaintiff complained she had experienced back pain for three years.  She was told to exercise but declined.  An x-ray was ordered and she was started on Naprosyn.  (Tr. 280).

In February 2003, plaintiff was seen twice for back pain, which had bothered her since shortly after Christmas.  She had no numbness or tingling; straight leg raising was negative; she had normal sensation to light touch; her deep tendon reflexes (DTRs) were equal; and strength was equal bilaterally.  She had mild tenderness and was in no apparent distress.  Plaintiff was prescribed back strengthening exercises and pain medication.  (Tr. 276-277).

In June 2003, plaintiff received stitches for a chin laceration at the Brown County General Hospital emergency room after she fell while intoxicated.  (Tr. 211-13).  Plaintiff complained of anxiety, which she attributed to problems she was currently having with her husband.

In November 2003, plaintiff underwent a left open carpal tunnel release.  (Tr. 338-39).  In March 2004, plaintiff underwent a right trigger thumb release.[1]  (Tr. 336-37).

In October 2005, plaintiff complained of low back pain occurring over the last two weeks.  She was in no apparent distress.  She had good range of motion of the spine without difficulty; there was no point tenderness on palpation; and straight leg raising was negative.  Dr. Holliday diagnosed acute exacerbation of chronic pain and recommended Ibuprofen, Tramadol,

---

[1]Trigger thumb is a painful condition in which the thumb locks when it is  flexed or extended. http://medical-dictionary.thefreedictionary.com/ (last accessed 9/12/11)

Flexeril at night, and a Lidoderm patch, and he gave plaintiff exercises to do. (Tr. 248).

In January 2006, plaintiff was diagnosed with a contusion and hematoma of the thigh and buttock following a fall, but she was in no apparent distress. (Tr. 245).

In May 2006, plaintiff saw Dr. Holliday for exacerbation of chronic back pain occurring over the preceding two to three months. Plaintiff had spasm of the paraspinal musculature and tenderness of the thoracic spine but was in no apparent distress. She could bend forward but described discomfort in doing so, and she could exercise but with increased pain. She had no lower extremity neurological signs such as numbness, tingling, or weakness. (Tr. 241). Dr. Holliday prescribed Ultram and Tizanidine and gave her exercises to do. He offered to send her to physical therapy if she could afford it.

The following month, plaintiff reported to Dr. Holliday that she had experienced back pain for 10 years. She reported pain at night which was relieved by lying on her side. She denied lower extremity or neurological symptoms. Plaintiff was normal in appearance. Her back was somewhat tender in the lumbar spine. DTRs were normal. Dr. Holliday prescribed Tylenol No. 3 and gave her Celebrex samples. (Tr. 240).

On July 10, 2006, Dr. Holliday diagnosed plaintiff with back pain likely secondary to fibromyalgia. Her medications included Cymbalta, Vicodin, Celebrex, and Zanaflex. (Tr. 239).

State agency physician Jerry McCloud, M.D., reviewed the record and completed a physical RFC assessment on August 8, 2006. (Tr. 320-27). Dr. McCloud opined that plaintiff could lift/carry 50 pounds occasionally; frequently lift/carry 25 pounds; stand/walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. Her ability to push/pull was unlimited, and her ability to reach in all directions was limited. She could occasionally climb

ladders/ropes/scaffolds.  Dr. McCloud opined that plaintiff's statements were partially credible.

On August 10, 2006, plaintiff saw Dr. Holliday for a chronic pain follow-up.  Dr. Holliday reported she had a history of what he believed to be fibromyalgia, although most of her pain was localized in the spine and paraspinal muscle region.  He noted that x-rays of the thoracic and lumbar spine were essentially normal.  She had no evidence of radiculopathy.  Dr. Holliday noted that plaintiff was in no apparent distress and appeared to be fairly comfortable.  He reported that there was no visible or palpable abnormality of the lumbar and thoracic spine, although plaintiff did have some tenderness to medium pressure over her paraspinal musculature, particularly on the left side, which had flared up that morning.  Dr. Holliday diagnosed plaintiff with chronic pain with the "likely" etiology being fibromyalgia, for which he prescribed Cymbalta.  He reported that she needed specialty evaluation when she obtained her medical card, but she was unable to afford an evaluation at that time.   (Tr. 237-38).

Dr. Holliday wrote in his September 27, 2006 office notes:  "Regarding pain, [patient] was thought to possibly have fibromyalgia.  She is [waiting] to get a Medical Card so we can get specialty evaluation in compliance with state medical guidelines regarding chronic opioids.  [Patient] states her pain is well controlled at this time.  No side effects on the medication."  (Tr. 237).

In March 2008, on a follow-up visit for back pain and bipolar depression, Dr. Holliday reported that plaintiff's mood was very good and she was sleeping well.  Her back pain symptoms were stable on her present regime, and although plaintiff rated her pain as 8 out of 10, she described the symptoms as manageable.  (Tr. 440).

In April 2008, plaintiff saw Dr. Holliday for fibromyalgia and back pain follow-up.  She

reported her back pain was well-controlled. She had some tenderness in the paraspinal musculature upon examination of the back but was in no apparent distress. (Tr. 439).

In June 2008, Dr. Holliday reported that plaintiff's fibromyalgia pain was stable and she had no side effects from medication. She was in the process of getting a medical card. She was in no apparent distress and appeared to be fairly comfortable. (Tr. 435).

In July 2008, plaintiff came to Dr. Holliday for follow-up on a few issues. She had insurance at that time. Dr. Holliday reported she was stable on medications for fibromyalgia and bipolar disorder. (Tr. 434). She was in no apparent distress and her pain was well-controlled. She was doing well without side effects from her medication. He continued her on her present medication for bipolar disorder.

## B. Mental Impairments

In August 2001, Dr. Holliday diagnosed plaintiff as under increased stress, possibly related to fatigue and weight loss. Dr. Holliday stated that possible depression should be considered. Plaintiff was not prescribed any medication. (Tr. 284).

At a June 2003 office visit, plaintiff reported difficulty sleeping and irritability after recently separating from her husband. She was not on antidepressants. She requested something for her nerves. She was diagnosed with anxiety and depression. Lisa Cooper, FNP, noted that plaintiff was to be started on Lexapro and Klonopin. (Tr. 273).

In July 2003, plaintiff complained to Dr. Holliday of some anxiety and depression. She reported that she had experienced some depression in the past when her father died. (Tr. 272).

In November 2004, plaintiff complained she was having "a lot of anxiety and stress" which affected her sleep and her relationships with other people. She reported that she felt this

way in the past when she was going through a divorce. She reported Klonopin and Lexapro had helped her tremendously when she had taken it previously and had not caused side effects. (Tr. 267).

In December 2004, Dr. Holliday reported that plaintiff had a history of anxiety for which she took Clonazepam and Lexapro, but plaintiff's mood had been good; she had not suffered any anxiety attacks "since she has been seen;" and she had not suffered any adverse effects from her medication. (Tr. 266).

On January 14, 2005, Dr. Holliday discussed tapering off Clonazepam for anxiety. (Tr. 264-265).

Dr. Holliday saw plaintiff on January 26, 2005, for follow-up of depression and other issues. She had no suicidal ideation and her symptoms were well-controlled on Lexapro and Klonopin. She was continued on these medications. (Tr. 263).

In February 2005, plaintiff complained of chest wall pain. She was taking Klonopin at the time. (Tr. 262).

In March 2005, plaintiff complained that she was "stressed out" because of her mother, who likely had problems with mild dementia. Plaintiff reported she would get upset and take an extra Clonazepam without the doctor's permission. She denied drug or alcohol use. Plaintiff's diagnoses included depression. Her prescription for Lexapro was increased, and the prescription for Clonazepam was increased on a temporary basis. (Tr. 258-259).

In May 2005, plaintiff came to Dr. Holliday's office for anxiety follow-up. Her medication was working very well. (Tr. 255).

In August 2005, plaintiff saw Dr. Holliday for depression follow-up. She reported no

suicidal ideation, and her mood had been fairly good.  She had been under some increased stress recently mainly secondary to living with her mother; she had some symptoms of fatigue, which she felt coincided with her social situation; and she sometimes lacked motivation.  Plaintiff was taking Clonazepam as needed for anxiety, which was working.  (Tr. 250).  She had no side effects from her medication.  Dr. Holliday diagnosed plaintiff with depression and continued her present medication with the possibility of increasing the dosage  on her next visit if she did not feel better.

During her September 2005 office visit with Dr. Holliday, plaintiff denied anxiety symptoms except for heart palpitations, and Dr. Holliday reported no other classic symptoms of a panic disorder.  (Tr. 249).

In June 2006, plaintiff reported occasional sleep problems but no suicidal ideation, no anhedonia, and no tearful affect.  She reported her main problems were anxiety and panic attacks which seemed to be controlled by Klonopin, for which she had a twice-daily prescription but which she sometimes took only once.  Dr. Holliday prescribed Cymbalta, noting:  "No active depression at this time but I think this could help her with her chronic pain as well as her anxiety symptoms."  At this visit, plaintiff reported that her primary role was caretaker of her mother who had dementia and other health problems, including atrial fibrillation.

Plaintiff was referred to consultative examining psychologist Dr. Richard E. Sexton, Ph.D., for a mental examination on June 20, 2006.  (Tr. 299-303).  Plaintiff reported that she seldom used alcohol.  She reported she had never been treated by a psychologist or psychiatrist. Plaintiff reported that she last worked in 2004 until she injured her back.

Plaintiff showed no abnormalities in flow of conversation and thought.  Her affective

range was limited and overall demeanor was flat. She reported being depressed. She reported occasional feelings of guilt, hopelessness, helplessness, and worthlessness and a reduced energy level. She denied frequent tearful periods and she denied mood swings. She described having twice-monthly "panic attacks," which she described as episodes lasting up to ten minutes in which her heart raced, she had shortness of breath, and she felt as though she was having a heart attack.

Plaintiff's hypothetical judgment appeared to be erratic. She appeared capable of performing the activities of daily living. Plaintiff indicated she is able to do some cooking, cleaning, laundry and grocery shopping. She reported she took care of her mother during the day.

Dr. Sexton concluded plaintiff appeared to be suffering from long-standing dysthymic and anxiety disorders which manifested themselves through appetite and sleeping problems, depressed mood, suicidal ideation with no attempts and no such thoughts presently, a reduced level of sexual desire, occasional feelings of guilt, hopelessness, helplessness, and worthlessness, periods of exacerbated anxiety, and a limited peer support group and social/recreational activities. Dr. Sexton assigned her a GAF score of 55-59.[2]

Dr. Sexton concluded that plaintiff appeared capable of performing simple repetitive-type tasks; she appeared able to understand, recall and carry out simple instructions; her ability to interact with other people, including co-workers and supervisors, appeared to be fair; and her

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *Id.*

ability to tolerate daily stress and the pressures of the work environment appeared to be fair as well, depending on the level of demand and her current emotional and physical status.  (Tr. 303).

In July 2006, state agency psychologist Mel Zwissler, Ph.D., reviewed the record and completed a "Psychiatric Review Technique."  (Tr. 305-318).  Dr. Zwissler opined that plaintiff has no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration.  (Tr. 315).  Dr. Zwissler gave controlling weight to the report of the consultative examining psychologist, Dr. Sexton.  Dr. Zwissler found plaintiff's statements were credible.  Dr. Zwissler adopted Dr. Sexton's findings that plaintiff appeared capable of performing simple repetitive-type tasks; she appeared able to understand, recall and carry out simple instructions; her ability to interact with other people, including co-workers and supervisors, appeared to be fair; and her ability to tolerate daily stress and the pressures of the work environment appeared to be fair as well, depending on how demanding they are and her current emotional and physical status.  (Tr. 317).

On January 11, 2007, plaintiff underwent a mental examination at Clermont Counseling at the request of her attorney "to help with SSI benefits."  (Tr. 341).  Plaintiff reported that she had no limitations in activities of daily living "except when she is physically not feeling well."  (Tr. 342).  She reported that she struggles with motivation.  (*Id*.)  Plaintiff reported that she last worked four years ago.  (Tr. 343).  Boxes were checked on the assessment form indicating plaintiff did not want to work and that she was concerned employment would affect benefits.  (Tr. 343).

Plaintiff reported feelings of worthlessness/hopelessness, low energy and low motivation.

She reported excessive worry and panic attacks. She reported no problems with oppositional behavior, inattention/concentration, impulsivity, disturbed reality contact, or mood swings. She indicated that she had difficulty falling asleep and staying asleep but that she averaged 6-7 hours of sleep a night.

On mental status exam, no issues were noted. The examiner reported that plaintiff was slow to answer the orientation, memory and abstract questions. Plaintiff reported symptoms of depression and anxiety related to her medical condition and level of pain and events from her past, and grief issues from her father dying in 1995.

Plaintiff's diagnoses were listed as dysthymia with fibromyalgia and relationship and financial problems. She was assigned a GAF score of 60. Recommendations were to decrease depressive symptoms, increase self-esteem, and explore vocational options. Service recommendations were for outpatient individual counseling and a vocational program.

In December 2007, plaintiff was tapering off Cymbalta. (Tr. 448). In January 2008, Dr. Holliday tentatively diagnosed plaintiff with "bipolar II" based on a history of alternating depression with hypomanic mood with irritability and a decreased need for sleep. He reported that plaintiff had not responded to two different antidepressants. (Tr. 444).

In April 2008, Dr. Holliday noted that plaintiff wished to increase her Klonopin, whereas he wanted to keep it the same and have her see a counselor. Plaintiff agreed reluctantly. (Tr. 437). In June 2008, Dr. Holliday reported plaintiff had a history of "likely bipolar depression" for which she was taking Zyprexa and Citalopram. (Tr. 435). He noted the possibility that she might have to become the guardian of her mother, which was very stressful for plaintiff. (*Id.*).

### III. Analysis

#### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three. *Rabbers*, 582 F.3d at 652 (citing 20 C.F.R. § 404.1520a(a)). At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Id.* at 652-53 (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment" in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id*. at 653 (citing 20 C.F.R. §§ 404.1520a(b)(2), (c)(3)). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. *Id*. (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more. *Id*. If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 404.1520a(d)(2)).

**B.  The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant met the insured status requirements of the Social Security Act
> through March 31, 2002.

> 2. The claimant has not engaged in substantial gainful activity since December 15,
> 2001, the alleged onset date (20 C.F.R. 404.1571 et seq., and 416.971 et seq.).

> 3. The claimant has the following severe impairments: degenerative changes of
> the lumbosacral spine; fibromyalgia; pancreatitis; irritable bowel syndrome; status
> post-right hand trigger thumb release; and status post left carpal tunnel release (20
> C.F.R. 404.1521 et seq. and 416.921 et seq.).

> 4. The claimant does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926).

> 5. After careful consideration of the entire record, the [ALJ] finds that the
> claimant has the residual functional capacity to perform medium work as defined
> in 20 C.F.R. 404.1567(c) and 416.967(c) except that she can perform only
> occasional climbing of ladders, ropes, and scaffolds.

> 6. The claimant is capable of performing past relevant work as a retail store
> manager and cashier.  This work does not require the performance of work-related
> activities precluded by the claimant's residual functional capacity (20 C.F.R.
> 404.1565 and 416.965).

> 7. The claimant has not been under a disability, as defined in the Social Security
> Act, from December 15, 2001 through the date of this decision (20 C.F.R.
> 404.1520(f) and 416.920(f)).

(Tr. 16-23).

**C.  Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v.*

13

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007)). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by failing to afford sufficient weight to the opinions of his treating physician, Dr. Holliday; (2) the ALJ erred by finding that his mental impairment was not severe; and (3) this matter should be remanded for consideration of new and

material evidence.

**1. This matter should not be remanded for consideration of new and material evidence.**

Plaintiff seeks a remand pursuant to Sentence Six of § 405(g) so that evidence presented to the Appeals Council and to this Court can be considered by the ALJ. The evidence consists of the following: (1) a letter drafted by Dr. Holliday on December 6, 2008, describing plaintiff's self-reported symptoms and Dr. Holliday's physical findings (Tr. 8-10); and (2) a disability assessment report prepared by Dr. James J. Rosenthal, Psy.D., who examined plaintiff on May 28, 2008, for purposes of public assistance. (Tr. 494-500).

When the Appeals Council declines review, as it did in this case, it is the decision of the ALJ and therefore the facts before the ALJ that are subject to appellate review. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). The Court may not consider evidence presented for the first time to the Appeals Council or to the Court in deciding whether to uphold, modify, or reverse the ALJ's decision. *Id*. at 696. *See also Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996). Accordingly, the Court may not consider Dr. Holliday's December 6, 2008 letter and Dr. Rosenthal's May 2008 evaluation in deciding whether to uphold, modify, or reverse the ALJ's decision.

"The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline*, 96 F.3d at 148. Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Evidence is considered "material" if there is "a reasonable

15

probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). To show "good cause," the moving party must present a valid justification for failing to acquire and present the evidence for inclusion in the ALJ hearing. *Id.* (citing *Wells v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984)).

Here, Dr. Holliday's report is new because it did not exist prior to the administrative hearing and was never reviewed by the ALJ. *See Clark v. Commissioner of Social Sec.*, Case No. 1:08-cv-70, 2009 WL 1546355, at *4 (S.D. Ohio May 28, 2009). However, the evidence presented by Dr. Holliday is not material because there is not a reasonable probability that the ALJ would have reached a different decision had this evidence been available to him. *Id.* Dr. Holliday's report is largely cumulative in that he simply summarizes plaintiff's self-reported symptoms, her treatment history, and his findings relating to the period prior to the ALJ's decision. In addition, plaintiff offers no reason for failing to obtain the report prior to the ALJ hearing. Plaintiff simply alleges that the report "was received after the hearing decision was issued." (Doc. 10 at 15). Plaintiff therefore has not made the required showing of good cause for her failure to have acquired and presented the evidence before the ALJ issued his decision in this matter. Thus, remand based on Dr. Holliday's report is not warranted.

Nor is remand warranted based on the report issued by Dr. Rosenthal. Dr. Rosenthal's report was issued in connection with his May 2008 evaluation and therefore predates the ALJ hearing by several months. Thus, the evidence is not new. Furthermore, assuming Dr. Rosenthal's report is material, plaintiff offers no valid justification for failing to obtain and

present the report during the administrative proceedings. Plaintiff simply asserts that although Dr. Rosenthal completed his examination in May 2008, "this was not made known to Plaintiff's counsel." (Doc. 10 at 16). Counsel's lack of awareness of particular evidence does not establish that such evidence was unavailable during the course of the administrative proceedings, nor does it establish the presence of an obstacle to the timely submission of such evidence which was outside of plaintiff's control. *See Burt v. Astrue*, No. 1:09-cv-227, 2010 WL 3851733, at *13 (E.D. Tenn. July 6, 2010) (Report and Recommendation) (good cause not shown where existence of records was not known to counsel because of client's likely decision not to provide them), *aff'd*, 2010 WL 3843784 (E.D. Tenn. Sept. 27, 2010). The fact that plaintiff's counsel was unaware of the existence of Dr. Rosenthal's report does not constitute good cause for failure to present the report prior to the issuance of the ALJ's decision. For these reasons, this matter is not appropriate for a remand under Sentence Six of Section 405(g).

Accordingly, this matter should not be remanded under Sentence Six of Section 405(g) for consideration of Dr. Holliday's December 2008 letter or Dr. Rosenthal's May 2008 evaluation results.

## 2. The ALJ did not err in determining plaintiff's RFC.

Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinion of Dr. Holliday, her treating doctor, who opined that she was limited to less than sedentary work. Plaintiff asserts that Dr. Holliday's opinion is supported by examination findings, objective test reports, and his overall interaction with her. Plaintiff contends that when treating her for back pain during the years 2001 to 2006, Dr. Holliday often found tenderness on examination and prescribed physical therapy, Vicodin, and anti-inflammatories; he opined that plaintiff's pain was

due to fibromyalgia based on examination findings of tenderness, pain and multiple trigger points; he found positive straight leg raising on exam and decreased sensation in plaintiff's foot in October of 2006; and an October 2006 MRI showed disc bulge with facet hypertrophy at L3 through L5 and disc protrusion at L5-S1. (Doc. 10 at 10-11, citing Tr. 288). Plaintiff asserts that Dr. Holliday prescribed pain medication for her and wanted to refer her to a specialist because her pain was so severe, but she could not afford to see a specialist.

The Commissioner argues that the ALJ fully explained his reasons for rejecting the opinion of Dr. Holliday and determining that the opinions of the state agency reviewing physicians, who found plaintiff was capable of medium work, were more consistent with the evidence of record.

Dr. Holliday gave an opinion on plaintiff's medical condition and how it affected her ability to work in a letter dated October 3, 2006. (Doc. 10, Exh. A).[3] Dr. Holliday wrote that plaintiff "has a history of what I believe is fibromyalgia." He described her primary complaint as "difficulty with low back pain" but stated she also had difficulties with fatigue, morning stiffness, comorbid depression and anxiety, and [] multiple tender points. He stated that a laboratory evaluation had not revealed any primary cause for her symptoms such as connective tissue disease, "making fibromyalgia more likely." Dr. Holliday wrote that her treatment consisted of antidepressants, "a modest amount of pain medication," and non-narcotic pain medication. Dr. Holliday concluded that although plaintiff had experienced some improvement, she "still has significant difficulties with daily functioning" and he believed "at this time she is

---

[3]Although plaintiff submitted Dr. Holliday's October 3, 2006 letter and Dr. Holliday's July 10, 2007 assessment at the ALJ hearing (Tr. 28) and the ALJ references the documents in his decision as Exhs. 12F and 13F (Tr. 22), the letter and assessment are not part of the administrative record. Accordingly, plaintiff has attached the documents to her Statement of Errors as Exhs. A and B.

not able to work secondary to these problems."  Dr. Holliday suggested if a long-term evaluation was needed for disability purposes, he would recommend "a more formal functional evaluation."

Dr. Holliday completed a basic medical assessment for public assistance purposes.  (Doc. 10, Exh. B).  He reported the date of last examination as July 10, 2007.  Dr. Holliday listed plaintiff's diagnoses as fibromyalgia (onset more than 10 years), depression, panic attacks, and GERD with vomiting.  Dr. Holliday opined that plaintiff can stand/walk 3 hours in an 8-hour workday and one-half hour without interruption; sit 6 hours in an 8-hour workday and 45 minutes to one hour without interruption; and frequently lift/carry up to 5 pounds.  He reported that pushing/pulling was moderately limited, and bending was extremely limited.  He concluded that plaintiff was unemployable for 12 months or more.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.  "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997).  *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.").  Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor.  *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987).  If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight.  20 C.F.R. § 404.1527(d)(2); *see also Blakley*, 581 F.3d at 406; *Wilson*, 378

F.3d at 544.  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion.  20 C.F.R. § 404.1527(d).  These factors include the length, nature and extent of the treatment relationship and the frequency of examination.  20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544.  In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544.  The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source.  20 C.F.R. § 404.1527(d).  When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a

specialist." 20 C.F.R. § 404.1527(d)(5).

Here, in formulating plaintiff's RFC, the ALJ gave "little weight" to Dr. Holliday's assessment of plaintiff's physical functioning and rejected Dr. Holliday's opinion that plaintiff was unable to work as of October 3, 2006. (Tr. 22). The ALJ instead gave significant weight to the August 2006 assessment of the state agency physician, Dr. McCloud, who concluded that plaintiff could perform a range of medium work, except the ALJ rejected Dr. McCloud's limitations on overhead reaching as unsupported by the record. (*Id.*, citing Tr. 320-327). The ALJ found Dr. McCloud's assessment to be most consistent with the medical evidence of record and the treatment history. (*Id.*). For the reasons explained below, the ALJ's decision finds substantial support in the record.

Initially, the Court notes that although the ALJ accepted Dr. Holliday's diagnosis of fibromyalgia, the ALJ was not required to find plaintiff was disabled based solely on a finding she suffered from this severe impairment. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x. 801, 806 (6th Cir. 2008) ("diagnosis of fibromyalgia does not automatically entitle a plaintiff to disability benefits"). Although "some people may have a severe case of fibromyalgia as to be totally disabled from working . . . most do not and the question is whether [the plaintiff] is one of the minority." *Id.* (citing *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996)). As set forth in more detail below, the ALJ here relied on several factors, in addition to a lack of objective findings, to determine that plaintiff is not one of the minority whose fibromyalgia symptoms are so severe as to be disabling. *See Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)) ("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia,

opinions that focus *solely* upon objective evidence are not particularly relevant.") (emphasis added). In rejecting Dr. Holliday's assessments as to the severity of plaintiff's symptoms and resulting limitations, the ALJ reasonably relied on Dr. Holliday's failure to provide support in his reports for his conclusory opinions; the absence of medical findings in the treatment notes to support the restrictions he imposed; and Dr. Holliday's heavy reliance on plaintiff's subjective complaints, which the ALJ determined to be less than credible.

First, the ALJ reasonably discounted Dr. Holliday's opinions based on his failure to provide supporting findings for his conclusions in his reports. Dr. Holliday did not provide any history of plaintiff's problems in his 2007 assessment, such as date of onset of her impairments, duration of her impairments, treatment and prescribed medications, or prognosis, and he did not set forth any physical findings to support his opinion. (Tr. 22, citing Exh. 12F- Doc. 10, Exh. B). Instead, Dr. Holliday simply listed plaintiff's medical conditions; marked her restrictions on the form; and included a few sparse supporting observations and medical evidence, which consisted solely of decreased range of motion "LS" and "multiple (>11) tender points." (*Id.*, citing Exh. 12F-Doc. 10, Exh. B). Similarly, in his October 2006 letter, Dr. Holliday gave no indication as to the onset date of plaintiff's alleged disability; he provided few objective findings to support a finding of total disability; and he reported that plaintiff was receiving only a modest amount of pain medication. (Tr. 22, citing Exh. 13F- Doc. 10, Exh. A).

Second, the ALJ reasonably relied on a lack of supporting findings in the treatment records to discount Dr. Holliday's assessment as to the degree of plaintiff's limitations. The ALJ noted that while plaintiff testified to excruciating back pain, Dr. Holliday's treatment records document only periodic complaints of back pain and do not include clinical findings consistent

with a finding of disability. (Tr. 21). The records show that in 2005, plaintiff complained of an exacerbation of chronic back pain but had good range of motion of the spine without difficulty; there was no point tenderness on palpation; straight leg raising was negative; and Dr. Holliday recommended that she defer using Vicodin, a strong pain medication. (Tr. 248). In May 2006, although plaintiff complained of worsening back pain, spasms and tenderness, she had no lower extremity neurological symptoms; the following month she was prescribed only Tylenol #3 for back pain; and in September 2006 it was reported that her back pain was well-controlled. (Tr. 236, 240-42). An October 2006 MRI showed only mild lumbosacral degenerative changes. (Tr. 288). Moreover, records from April 2008 show that plaintiff's back pain has been well-controlled. (Tr. 439). As of the date of the hearing she was taking little pain medication, despite treatment records showing no reported side effects from the medication. Finally, the record shows no significant or consistent treatment for plaintiff's hands following her surgeries.

Third, the ALJ reasonably discounted Dr. Holliday's opinions in view of his heavy reliance on plaintiff's subjective complaints. In addition to the lack of findings in the treatment notes to support the functional limitations imposed by Dr. Holliday as a result of plaintiff's physical impairments, the ALJ found plaintiff's complaints of disabling pain to be less than fully credible for reasons the ALJ thoroughly explained. (Tr. 20-22). The ALJ reasonably discounted plaintiff's credibility based on a lack of objective findings in the record as well as evidence showing that plaintiff reported throughout the course of her treatment that her pain was well-controlled; she gave testimony about side effects from her medication which was inconsistent with the medical records; she made several inconsistent representations about her work history; she had demonstrated a poor work ethic; and she had expressed concern during her evaluation at

Clermont Counseling that obtaining employment would affect her eligibility for benefits. (Tr. 20-22). The ALJ reasonably determined that the treatment records do not support plaintiff's complaints of disabling pain. The record shows that Dr. Holliday's diagnosis of fibromyalgia was tentative at best, Dr. Holliday consistently reported in his treatment notes that plaintiff's symptoms were well-controlled, and he repeatedly observed that plaintiff did not appear to be in pain. (Tr. 276-77, 2/03-plaintiff was in no apparent distress; Tr. 249, 9/05-same; Tr. 248, 10/05-same; Tr. 245, 1/06-same; Tr. 241, 5/06-same; Tr. 240, 6/06- same; Tr. 237-38, 8/06-plaintiff appeared to be fairly comfortable and was in no apparent distress; Tr. 236, 1/06-plaintiff's pain was well-controlled; Tr. 440-3/08-plaintiff was sleeping well, her back pain symptoms were stable, and she reported her symptoms were manageable; Tr. 439, 4/08-plaintiff's back pain was well-controlled; Tr. 435, 6/08-fibromyalgia pain was stable, plaintiff was in no apparent distress, and she appeared to be fairly comfortable; Tr. 434, 7/08- plaintiff was stable on medication for fibromyalgia, she was in no apparent distress, her pain was well-controlled, and she was doing well without side effects from medication). The ALJ's reasons for discounting plaintiff's subjective complaints of disabling pain find substantial support in the record, and the Court must therefore defer to the ALJ's credibility finding. *See Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981).

The ALJ was entitled to give less than controlling weight to Dr. Holliday's assessments based on Dr. Holliday's failure to provide support in his reports for his conclusory opinions; the absence of medical findings in the treatment notes to support the restrictions he imposed; and Dr. Holliday's heavy reliance on plaintiff's subjective complaints which the ALJ determined to be less than credible. *See Hicks v. Astrue*, No. 3:09-cv-452, 2011 WL 94696, **2-3 (S.D. Ohio Jan.

10, 2011) (Black, J.).  *See also Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112-113 (6th Cir. 2010) (ALJ may discount treating physician opinion that is inconsistent with substantial evidence in the record, including physician's own treatment notes).  The ALJ's decision to instead accord significant weight to the opinion of the state agency reviewing physician, Dr. McCloud, on the ground it is more consistent with the medical evidence of record and plaintiff's treatment history finds substantial support in the record.  Dr. McCloud noted some positive examination findings by Dr. Holliday, including back spasms and tenderness in the thoracic spine.  (Tr.  22, citing Tr. 321-22).  However, these examination findings were minimal.  Moreover, Dr. McCloud noted plaintiff had no positive neurological signs or symptoms and she had full range of motion of the back.  *Id.*

Although the ALJ must articulate "good reasons" for not giving the opinions of a treating physician controlling weight, the ultimate determination of disability rests with the ALJ.  *White v. Commissioner of Social Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) (citing *Walker*, 980 F.2d at 1070).  Here, the ALJ thoroughly explained his reasons for giving "little weight" to Dr. Holliday's opinions, and those reasons find substantial support in the record.  Plaintiff's second assignment of error should not be upheld.

**3.    The ALJ did not err in assessing the severity of plaintiff's mental impairments.**

Plaintiff contends that the ALJ erred by finding her mental impairment is non-severe.  Plaintiff argues that the medical evidence of record does not support the ALJ's finding that her depressive disorder and anxiety did not cause more than minimal limitations in her ability to perform basic mental work activities.  Plaintiff alleges that the ALJ erred by failing to properly explain why he rejected the findings of plaintiff's treating physician, Dr. Holliday, regarding her

depression and anxiety, and by instead relying on the reports of the state agency reviewing psychologist, Dr. Zwissler, and the report of the consultative examining psychologist, Dr. Sexton.

The Commissioner argues the ALJ's finding that plaintiff does not have any severe mental impairments is supported by substantial evidence. The Commissioner asserts that Dr. Holliday never opined that plaintiff would have any functional limitations as a result of her mental health impairments, and the ALJ reasonably relied on plaintiff's activities of daily living, her demonstrated social skills, the assessments of the state agency reviewing psychologists, and the report from Clermont Counseling in support of his finding.

A severe impairment or combination of impairments is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c); 416.920(c). Basic work activities are the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions and the ability to understand, carry out and remember simple instructions; use judgment; respond appropriately to supervisors and co-workers; and deal with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b); 416.921(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357-58 (6th Cir. 1984). An impairment will be considered non-severe only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimus* hurdle"

in the sequential evaluation process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  *See also Rogers*, 486 F.3d at 243 n.2.

Under the Social Security Regulations, once the ALJ determines a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps of the sequential evaluation process.  20 C.F.R. §§ 404.1545(e), 416.945(e).  If an ALJ considers all of a claimant's impairments (both severe and non-severe) in determining the claimant's RFC, the ALJ's failure to characterize additional impairments as "severe" is not reversible error.  *See Glenn v. Astrue,* Case No. 3:09-cv-296, 2010 WL 4053548, at *14 (S.D. Ohio Aug. 13, 2010) (citing *Maziarz v. Sec. of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987)).

In the mental context, 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1) provide as follows:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see §§ 404.1521, 416.921).

The ALJ determined that plaintiff's medically determinable mental impairments are non-severe because they cause no more than mild limitations in any of the first three functional areas described in the above regulations and no episodes of decompensation of an extended duration in the fourth area.  (Tr. 18).  In making this determination, the ALJ relied on the following evidence of record: (1) the July 2006 assessment of the state agency psychologist, Dr. Zwissler, (2) the assessment of the consultative examining psychologist, Dr. Sexton, and (3) the records from Clermont Counseling.  (Tr. 18-19).  As explained below, this evidence constitutes substantial

27

evidence which supports the ALJ's determination.

Dr. Zwissler opined that plaintiff's impairments are not severe. (Tr. 305). In addition, Dr. Zwissler was the only mental health professional to offer an opinion as to plaintiff's degree of limitation under §§ 404.1520a(d)(1) and 416.920a(d)(1). Dr. Zwissler opined that plaintiff has no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration, all of which support a finding of non-severe mental impairments. (Tr. 315). In rendering his opinion, Dr. Zwissler relied on the assessment of Dr. Sexton. Dr. Sexton opined that plaintiff is capable of performing simple repetitive-type tasks; she appeared able to understand, recall and carry out simple instructions; her ability to interact with other people, including co-workers and supervisors, appeared to be fair; and her ability to tolerate daily stress and the pressures of the work environment appeared to be fair as well, depending on the level of demand and her current emotional and physical status. (Tr. 303). Dr. Sexton assigned plaintiff a GAF score of 55-59. (Tr. 302). Dr. Sexton explained the bases for his findings in his report. (Tr. 302-03). The ALJ in turn fully explained his reasons for finding that plaintiff had no more than minimal limitations in her ability to perform basic work activities. (Tr. 18-19).

Nor was the ALJ required to find a severe mental impairment based on the GAF score assigned by Dr. Sexton. A GAF score of 55-59 "indicates moderate symptoms or moderate difficulty in social or occupational functioning, rather than the more serious symptoms or difficulty in functioning suggested by a score in the 40s." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (citing DSM-IV-TR at 34). Moreover, the Sixth Circuit has stated that it is "not aware of any statutory, regulatory, or other authority requiring the ALJ to put

stock in a GAF score in the first place." *Id.* (internal citations omitted). The ALJ's failure to find a severe mental impairment on the basis of plaintiff's GAF score is not reversible error.

The ALJ also properly relied on the January 2007 Clermont Counseling report in determining that plaintiff's mental impairments are non-severe. (Tr. 19, citing Tr. 341-351). During that evaluation, plaintiff reported she had no limitations in activities of daily living as a result of her mental health. Moreover, the report noted that plaintiff was seeking disability benefits, she did not want to work, and she was concerned that employment would affect her benefits. Plaintiff was assigned a GAF score of 60[4]. The counselor recommended in addition to outpatient counseling that plaintiff pursue a vocational program. The report thus supports the ALJ's finding as to the severity of plaintiff's mental impairments.

Finally, the ALJ did not err by failing to properly explain why he rejected evidence from plaintiff's treating physician, Dr. Holliday, in determining that plaintiff does not have severe mental impairments. Plaintiff claims that the ALJ made no mention of Dr. Holliday's findings of depression and anxiety, for which Dr. Holliday prescribed Lexapro and Klonopin, and bipolar disorder, for which he prescribed Zyprexa. Plaintiff alleges that the evidence from Dr. Holliday clearly shows that plaintiff's depression and anxiety have more than a minimal impact on her ability to work.

Although the opinions of treating physicians are generally accorded greater weight than those of one-time examining physicians, *Walters*, 127 F.3d at 529-30, or than the contrary opinion of a non-examining medical advisor, *Shelman,* 821 F.2d at 321, there is no opinion of record from Dr. Holliday which contradicts the findings of Dr. Zwissler and Dr. Sexton. Dr.

---

[4]The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *Id.*

Holliday did not offer any opinions or make any findings in his reports of record regarding any functional limitations resulting from plaintiff's mental impairments. To the contrary, although Dr. Holliday diagnosed plaintiff with depression and anxiety and treated her with medication for these impairments (Tr. 17, citing Tr. 231-298), Dr. Holliday consistently noted that plaintiff's symptoms were well-controlled by the medication. (Tr. 267, 11/04-plaintiff reported she was presently undergoing a lot of anxiety and stress, and Klonopin and Lexapro had helped her tremendously in the past with these symptoms; Tr. 263, 1/05-plaintiff's symptoms were well-controlled on Lexapro and Klonopin; Tr. 255, 5/05-Klonopin was working very well; Tr. 250, 8/05-plaintiff reported her mood had been fairly good and Clonazepam as needed for anxiety was working; Tr. 240, 6/06-plaintiff reported her anxiety and panic attacks seemed to be controlled by Klonopin, which she was on twice daily but which she sometimes used only once; Tr. 448, 12/07-plaintiff was tapering off Cymbalta due to possible physical side effects without any changes in mood; Tr. 434, 7/08-plaintiff was doing well as to mood without side effects from medication and was stable on medications for bipolar disorder). Furthermore, Dr. Holliday's notes do not reflect that plaintiff's daily activities were limited due to her anxiety and depression. Accordingly, in the absence of any findings of record by Dr. Holliday showing that plaintiff suffered from a severe mental impairment, the ALJ did not err by failing to properly explain why he rejected evidence from Dr. Holliday.

Thus, while the evidence of record shows that plaintiff suffers from depression and anxiety, the ALJ's determination that these mental impairments impose no more than minimal limitations on plaintiff's ability to function in any work-related area finds substantial support in the record. Moreover, plaintiff has filed to demonstrate that she was harmed by the ALJ's

determination that her mental impairments were not "severe." The ALJ continued with the sequential evaluation, and plaintiff has not shown that "but for this error" she would have been found disabled at one of the last three steps of the sequential evaluation process. *See Jackson v. Astrue*, No. 4:10CV-0060-EHJ, 2010 WL 5290503, at *5 (W.D. Ky. Oct. 22, 2010). To the contrary, the VE testified there are jobs existing in the national economy plaintiff could perform if she were limited to unskilled sedentary work consisting of simple, routine, repetitive tasks (Tr. 64-65), which is consistent with Dr. Sexton's findings. (Tr. 302-03). Plaintiff does not argue that the number of such jobs identified by the VE is insignificant. Thus, any error by the ALJ in determining that plaintiff did not suffer from a "severe" mental impairment was harmless. *C.f. Heston v. Commissioner of Social Sec.*, 245 F.3d 528, 536 (6th Cir 2001) (holding ALJ's failure to reference physician's report in his findings was harmless error, so that reversal of non-disability determination was not mandated). Plaintiff's second assignment of error should be overruled.

## CONCLUSION

In accordance with the foregoing, it is hereby **RECOMMENDED** that this matter not be remanded under Sentence Six of Section 405(g) for consideration of new evidence and that thedecision of the Commissioner denying plaintiff's applications for DIB and SSI be **AFFIRMED**.


Date: <u>12/23/2011</u>                                    <u>s/Karen L. Litkovitz</u>
                                                      Karen L. Litkovitz
                                                      United States Magistrate Judge

LINDA SUE SMITH,                       Case No. 1:10-cv-923
      Plaintiff                     Spiegel, J.
                                 Litkovitz, M.J.

     vs

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).